the several justices and judges of said courts within their respective jurisdiction." 14 Stat. 385. The present case clearly belongs to the last category. The relator was certainly "restrained of his liberty in violation of a law of the United States." And although it may appear unseemly that a prisoner, after conviction in a state court, should be set at liberty by a single judge on habeas corpus, there seems to be no escape from the law. If it were a case in which the state court had jurisdiction of the offense, the general rule of the common law would intervene, and require that the prisoner should be remanded, and left to his writ of error. In such a case, although the judgment were erroneous, the imprisonment would not be in violation of the constitution or laws of the United States. The judgment might be wrong, but the imprisonment under it would be right until the judgment was reversed. But, as before shown, the state court had not jurisdiction of the offense. It might, however, be a wise amendment of this law, to provide that in all cases after conviction, the party should be put to his writ of error to the supreme court of the United States. The statutes above cited are condensed in section 753 of the Revised Statutes of the United States. They have had the effect greatly to enlarge the jurisdiction by habeas corpus in the courts of the United States since the first enactment on the subject in 1789. They have removed all impediment to its use which formerly existed where the prisoner was committed under state authority, provided his imprisonment is contrary to the United States constitution or laws.

The order of discharge must be affirmed.

NOTE [from original report]. The prisoner was thereupon discharged, but was immediately arrested upon a bench warrant from the United States court in Savannah, whither he was sent.

NOTE [from original report]. The opinion in the above case having been written in much haste—from the pressure of business on the circuit—and the subject being one of great importance, the circuit justice has revised it for the purpose of presenting his views more clearly and explicitly, and as revised it is above given.]

———

BRIDGES (REASON v.). See Case No. 11,-617.

BRIDGES (UNITED STATES v.). See Case No. 14,644.

———

## Case No. 1,863.

### The BRIDGETON.

[The case reported under this title in 11 Hunt. Mer. Mag. 268, is the same as Case No. 1,865.]

———

BRIDGETON (GREEN v.). See Case No. 5,-754.

## Case No. 1,864.

### The BRIDGEWATER.

[4 Cin. Law Bul. 448; 11 Chi. Leg. News, 327.]

District Court, E. D. Michigan. 1878.

SHIPPING—POWERS OF MASTER—SALE OF CARGO—WHEN VALID—TRADE ON GREAT LAKES — NECESSITY — COMMUNICATION WITH OWNER — EVIDENCE—SALVAGE SERVICES.

[1. In the trade upon the great lakes, where voyages are short, harbors of refuge many, and telegraphic communications with the owners easy, a master has no power to sell any portion of the cargo except where an immediate sale is the only alternative to a total loss by jettison.]

[2. To justify a sale of ship or cargo by the master it must appear that it was necessary that it was made in good faith, and that the master was unable to communicate with the owner before the necessity for action became imperative.]
[See Pope v. Nickerson. Case No. 11,274; Astrup v. Lewy, 19 Fed. 536; The Ann D. Richardson, Case No. 411; De Bruns v. Lawrence, Id. 3,716.]

[3. A sale of the cargo of a stranded ship by the master is unnecessary, and therefore void, if he could have transshipped or stored the cargo, or if he had any other alternative which a prudent owner on the spot would adopt.]

[4. The purchaser of the cargo of a stranded vessel upon a sale by the master will not be heard to say that a sale was necessary by reason of the purchaser's refusal to permit his vessel to be used for a transshipment.]

[5. The sale by the master of a vessel run aground near the straits of Mackinaw of her cargo of wheat, is void for bad faith on his part when it appears that the master proposed a corrupt sale to one of the purchasers; that the price was 10 cents a bushel when within twenty-five miles it was 50 or 60 cents, and the wheat was insured at a valuation of one dollar a bushel, and that the master did not disclose the transaction to his owners or underwriters, but absconded with the proceeds of the sale.]

[6. On setting aside a sale of cargo by the master of a stranded vessel as having been made in bad faith, the purchaser may be allowed compensation in the nature of salvage for caring for the cargo, but not the purchase money which the master has embezzled.]

[7. Persons who are in a position to render salvage services may make a reasonable bargain to that end, but they will not be allowed to take advantage of the peril of others by compelling a sale to themselves on unconscionable terms. Post v. Jones, 19 How. (60 U. S.) 150, followed.]

[In admiralty. Libel by the Traders' Insurance Company and other underwriters of the cargo of the schooner Bridgewater to recover from one Dingman and others a portion of said cargo, alleged to have been fraudulently sold by the master. Decree for libellants.]

In November, 1876, D. W. Erwin shipped on board the schooner at Chicago 36,000 bushels of wheat, consigned to Buffalo, upon which he effected an insurance of the same by libellants in the sum of $38,600. The schooner immediately left for Buffalo, and on Sunday, November 28th, about six o'clock in the evening, ran hard aground, in a heavy storm, upon Crane island, near